# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MILTON ROY, LLC,<br><br>    *Plaintiff,*<br><br>v.<br><br>NORTHEAST PUMP & INSTRUMENT, INC., *et al.*,<br><br>    *Defendants.* | CIVIL ACTION<br>NO. 17-5830 |

**PAPPERT, J.**                                                                                                                                                              **June 13, 2019**

## <u>MEMORANDUM</u>

Milton Roy, LLC sued Northeast Pump & Instrument, Inc., Christopher Marcos and JoAnn Chateauneuf Marcos on December 29, 2017, alleging damages arising from a former business relationship between the companies. The Complaint alleged claims against NPI for breach of contract (Counts I and II), Lanham Act violations (Counts III and IV) and fraudulent misrepresentation (Count V), a claim against Christopher and JoAnn Marcos for breach of fiduciary duty (Count VII) and claims against all three defendants for fraudulent transfers (Count VI) and civil conspiracy (Count IX). Milton Roy also sought to pierce NPI's corporate veil to hold Christopher and JoAnn Marcos liable for any judgment against NPI (Count VIII).

On April 26, 2019, Milton Roy moved for summary judgment on all claims. (ECF No. 44.) During oral argument on the Motion (ECF No. 50), the parties informed the Court that they had agreed to a consent judgment encompassing Counts I–IV of the Complaint and dismissing all claims against JoAnn Marcos with prejudice. (ECF No. 51.) Milton Roy also withdrew its Motion as to Counts V, VII and IX, *see* (*id.* at 7:10–

11), leaving for the Court to determine whether Milton Roy is entitled to summary judgment on Counts VI and VIII.[1]  The Court denies Milton Roy's Motion for the reasons that follow.

I[2]

NPI was incorporated in Massachusetts more than twenty years ago.  (Pl.'s Mot. Summ. J. ("Pl.'s Mot.") Ex. 1 ("Marcos Dep.") 7:23, 8:19, ECF No. 44-5.)  Christopher Marcos and his former partner, Dennis Hunt, each made capital contributions of $50,000.  (*Id.* at 8:1–14.)  Marcos has been NPI's sole owner and shareholder since 2004.  (Pl.'s SMF ¶ 34, ECF No. 44-2; Defs.' Resp. Pl.'s SMF ¶ 34, ECF No. 46-1.)  NPI pays Marcos an annual salary; in 2014, 2015 and 2016, he made $214,403, $196,535 and $8,933, respectively.  (Pl.'s SMF ¶¶ 77–79.)

According to Marcos, NPI does not keep meeting agendas or minutes.  (Marcos Dep. 47:1–48:1.)  Nor does NPI pay dividends to Marcos, its sole shareholder.  (*Id.*; Pl's SMF ¶ 34.)  During discovery, NPI stated it is not in possession of its own articles of incorporation or any other corporate documents because "[t]hey are held by [a] former attorney . . . [who] is not available and has been disbarred."  (NPI's Resp. Pl.'s Reqs. Produc. ¶ 1.)

---

[1]   Milton Roy raised its veil-piercing claim as a distinct cause of action in the Complaint, but "the doctrine of corporate disregard is not a cause of action but an equitable doctrine by which an act or obligation of a corporation giving rise to a cause of action may be charged to a principal of the corporation." *Kraft Power Corp. v. Merrill*, 146, 981 N.E.2d 671, 676 (Mass. 2013).  Because NPI has agreed to a consent judgment obligating it to pay certain damages to Milton Roy for breach of contract, *see* (ECF No. 51), the Court must conduct the veil-piercing analysis regardless of whether the only remaining claim to be decided by the Court, Count VI, survives.

[2]   The Court has already summarized the facts giving rise to this lawsuit (*see* ECF No. 20) and recites here only those facts relevant to Milton Roy's fraudulent transfer and veil-piercing claims.

2

Marcos is also the sole owner of Genesys Holdings, LLC, a realty trust formed in Massachusetts in 2004. (Pl.'s SMF ¶¶ 50–52.) Genesys owns two properties: NPI's warehouse in Lunenburg, Massachusetts and Marcos's home in Stratham, New Hampshire, a mixed-use commercial/residential property. (*Id.* at ¶¶ 54–55, 62–63; Marcos Dep. 83:23–84:1.) Genesys secured mortgage loans for the Lunenburg and Stratham properties in 2004 and 2006, respectively; NPI signed a commercial guarantee for both loans.[3] (*Id.* at ¶¶ 58–59, 65–66.)

Although NPI operated out of the Lunenburg property, it never executed a lease. (*Id.* at ¶ 56.) NPI wrote monthly checks to Genesys for $8,900 from at least January of 2014 to December of 2015.[4] (Pl.'s Mot. Ex. 6.) Marcos stated during his deposition that these checks were for "the [monthly] mortgages for the two locations"—the Lunenburg and Stratham properties—and "some of that [$8,900] was done as income to me." (Marcos Dep. 82:15–22.) He explained that NPI was funding the Stratham mortgage, even though it did not operate there, because "the intention was to open a second NPI location in New Hampshire." (*Id.* at 83:25–84:1.)

On May 7, 2012, NPI entered a Domestic Sales Distributor Agreement with Milton Roy, a developer and manufacturer of controlled volume metering pumps.

---

[3] In early 2019, the Lunenburg property was "taken . . . over by [Enterprise] bank" due to Genesys's failure to make mortgage payments and NPI's failure to repay a loan for which the property was used as collateral. (Marcos Dep. 23:16–23, 28:6–7.) As of March 12, 2019, NPI was "in the process of moving [its] operating systems to [Christopher Marcos's] house" in Stratham. (*Id.* at 25:19–22.)

[4] In January of 2015, however, NPI paid Genesys $11,326. (Pl.'s Mot. Ex. 6 at MR-00688.) During discovery, Milton Roy subpoenaed Enterprise Bank for all checks issued by NPI and Genesys beginning in January of 2014. *See* (Pl.'s Mot. Ex. 6; Hr'g Tr. 23:24—25, 73:7–9). Although the record does not contain checks issued to Genesys by NPI before 2014, it does show that Genesys received $106,800 in rental payments in 2013 (equivalent to payments of $8,900 per month). (Pl.'s Mot. Ex. 7 at MR 00038.)

(Compl., ECF No. 1; Compl. Ex. 1 ("Agreement").) The Agreement authorized NPI to distribute Milton Roy's products within a designated territory. (Agreement § 1.) On March 6, 2015, Milton Roy notified NPI it would be terminating the Agreement on July 4, 2015 due to NPI's failure to make timely payments. (Compl. Ex. 2.) Between March 6 and July 4, NPI continued to place orders for Milton Roy products totaling $240,910.27. (Pl.'s SMF ¶ 8.) This lawsuit was initiated, in part, because NPI never paid for those shipments; the parties' consent judgment obligates NPI to pay that sum plus interest. (ECF No. 51 ¶ 3.)

Sometime in 2015, NPI applied for a $200,000 loan, hoping it could "get current" on its payments to Milton Roy before Milton Roy terminated the Agreement. (Marcos Dep. 53:9–17; Pl.'s SMF ¶ 80.) According to Marcos, NPI "got the loan too late" to avoid termination. (Marcos Dep. 54:8–11.) NPI still approached Milton Roy about paying off its debt and reentering the Agreement, but "[b]y that time [Milton Roy] had already appointed another distributor." (*Id.* at 54:18–19.) NPI accordingly paid Milton Roy "whatever the number was that . . . [it] needed to pay to be able to continue to have product shipped to [it] . . . . And then at that point Milton Roy began to take orders from [NPI] directly again." (*Id.* at 55:23–56:2.)

II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "a reasonable jury could return a

4

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the non-moving party will not suffice. *Id.* at 252. There must be evidence by which a jury could reasonably find for the non-moving party. *Id.*

The movant bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of record which it believes demonstrate the absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004), *holding modified by Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Reviewing the record, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The Court may not make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

III

A[5]

Milton Roy argues that NPI fraudulently transferred $8,900 to Genesys each month during 2014 and 2015, a time when NPI was consistently late in its payments to Milton Roy in violation of the Distributor Agreement. *See* (Pl.'s Mem. 9.) In support of its claim, Milton Roy points to the fact that the $8,900 checks do not contain a memo line explaining their purpose, *see* (Pl.'s Mot. Ex. 6), that there was no lease agreement

---

[5] Count VI is asserted against both NPI and Marcos. In its Motion, Milton Roy does not argue that Marcos made any fraudulent transfers in his individual capacity. *See* (Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 8–9). The Court will accordingly consider only whether NPI is liable under Count VI.

5

between NPI and Genesys, (Pl.'s SMF ¶ 56), and Marcos's testimony that the checks were divided by Genesys three ways: to pay off the mortgages on the Lunenburg and Stratham properties and to compensate Marcos. (Marcos Dep. 82:15–22.) Milton Roy asks the Court to "claw back these transactions," apparently referring to every $8,900 check written during 2014 and 2015, under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa. Cons. Stat. § 5101, *et seq.*[6] The statute provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay or defraud any creditor of the debtor;[7] or

---

[6] In 2018, the PUFTA was renamed the Pennsylvania Uniform Voidable Transactions Act. *See In re Titus*, 916 F.3d 293, 299 n.3 (3d Cir. 2019).

Although Milton Roy asserts Count VI under Pennsylvania law in its Complaint, *see* (Compl. ¶ 93), it argues in its Motion that Massachusetts law applies. (Pl.'s Mem. 8–10.) NPI believes Pennsylvania law applies. (Defs.' Mem. Opp'n Mot. Summ. J. 12.) To determine which state's law applies, the Court applies Pennsylvania's choice-of law-rules. *Pac. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Pennsylvania law, the Court must first consider the substance of the laws in question and look for actual, relevant differences between them. *Id.* (citing *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007)). If there is no conflict, a choice of law analysis is unnecessary. *Id.* (citing *Hammersmith*, 480 F.3d at 230).

Milton Roy acknowledges that the PUFTA and the Massachusetts Uniform Fraudulent Transfer Act, Mass. Gen. Laws ch. 109A, § 1, *et seq.*, "have basically the same standard." (Hr'g Tr. 22:3–4.) Indeed, the text of the statutes is nearly identical. *See United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 113 (E.D. Pa. 2011) (noting that "a wide range of cases from other districts . . . have found that no choice of law conflict exists where both states have adopted the same relevant portions of the UFTA" and citing cases). Finding no true conflict between Pennsylvania's and Massachusetts's fraudulent transfer statutes and presented with none by the parties, the Court will apply Pennsylvania law.

[7] The statute provides eleven non-exhaustive factors for the Court to consider in determining the transferor's intent:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;

6

> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa. Cons. Stat. § 5104(a).[8] If the creditor establishes by a preponderance of the evidence that a fraudulent transfer was made, "the creditor may, *inter alia*, avoid the transfer or obligation, attach the transferred assets or other property of the transferee, obtain an injunction barring further transfers, or seek appointment of a receiver over the transferred asset." *K–B Bldg. Co. v. Sheesley Constr., Inc.*, 833 A.2d 1132, 1135–36 (Pa. Super. Ct. 2003) (citing 12 Pa. Cons. Stat. § 5107(a)); 12 Pa. Cons. Stat. § 5104(c).

Several genuine issues of material fact preclude summary judgment for Milton Roy on this claim. Milton Roy has not met its burden under § 5104(a)(1) to show that NPI actually intended to defraud Milton Roy when it wrote a check each month to Genesys, particularly given that NPI was merely late in making payments prior to March 6, 2015. There is no dispute that Milton Roy was eventually paid for shipments

---

> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa. Cons. Stat. § 5104(b).

[8]    In its Motion, Milton Roy argues that NPI violated subsection (1) of the statute. *See* (Pl.'s Mem. 9). During oral argument on the Motion, Milton Roy's counsel additionally argued that NPI violated subsection (2) by issuing the checks without receiving reasonable value in exchange. *See* (Hr'g Tr. 22:5–23:15). The Court will accordingly analyze Milton Roy's claim under both provisions.

before that date. Nor has Milton Roy met its burden under § 5104(a)(2) to show that there is no genuine issue of material fact as to whether NPI received a reasonably equivalent value in exchange for the checks to Genesys. Marcos testified that some of the money paid for the Lunenburg property, NPI's place of business, and some was used to fairly compensate Marcos for his services. He explained that if any part of the $8,900 was used to pay for the Stratham property, it is because NPI planned to open a second location there. (Marcos Dep. 83:25–84:1.)

B

Milton Roy also argues that the Court should pierce NPI's corporate veil because Marcos used the corporate structure to enrich himself to NPI's detriment. Under Massachusetts law,[9] Milton Roy must establish that veil-piercing is warranted by a preponderance of the evidence. *Birbara v. Locke*, 99 F.3d 1233, 1239 (1st Cir. 1996).

> Ultimately, the decision to disregard settled expectations accompanying corporate form requires a determination that the shareholder directed and controlled the corporation, and used it for an improper purpose, based on evaluative consideration of twelve factors:
>
> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

---

[9] The parties dispute whether Pennsylvania or Massachusetts law applies. Under Pennsylvania law, the veil-piercing analysis is governed by the law of the state of incorporation. *Pasternack v. Klein*, 2017 WL 10810183 at *7 (E.D. Pa. July 24, 2017) *aff'd*, 751 F. App'x 332 (3d Cir. 2018) (citing *Commonwealth v. Golden Gate Nat'l Senior Care LLC*, 158 A.3d 203, 236 (Pa. Commw. Ct. 2017), *aff'd in part, rev'd in part sub nom.*, *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010 (Pa. 2018)); *see also In re Sch. Asbestos Litig.*, 1993 WL 209719 at *3 (E.D. Pa. June 15, 1993) (citing *Broderick v. Stephano*, 171 A. 582 (Pa. 1934)). NPI was incorporated in Massachusetts, (Pl.'s SMF ¶ 33), so the Court applies Massachusetts law.

8

*Kraft Power Corp. v. Merrill*, 981 N.E.2d 671, 681 n.11 (Mass. 2013) (quoting *Scott v. NG U.S. 1, Inc.*, 881 N.E.2d 1125 (Mass. 2008)).

Viewing the facts in the light most favorable to Defendants, Milton Roy has not met its burden to show there is no genuine issue of fact precluding the Court from piercing NPI's corporate veil. Some factors do weigh in favor of veil-piercing—Marcos's pervasive control of NPI and NPI's failure to observe many corporate formalities, keep corporate records and pay dividends.[10] However, as discussed above, the record evidence does not establish that Marcos intermingled his personal assets with NPI's or siphoned away NPI's corporate assets by writing monthly checks to Genesys for $8,900, or that NPI was insolvent during the time of the litigated transactions, *see* (Hr'g Tr. 47:1–7). Milton Roy concedes that NPI was not established or operated as a fraudulent enterprise. (Hr'g Tr. 49:19–50:2.)

"[C]ontrol, even pervasive control, without more, is not a sufficient basis for a court to ignore corporate formalities: 'There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance [and] finagling . . . .'" *Scott*, 881 N.E.2d 1125, 1132 (2008) (quoting *Evans*, 574 N.E.2d 395, 400 (Mass. App. Ct. 1991)). Without more, the Court cannot find as a matter of law that Marcos ignored NPI's financial, legal and practical formalities in furtherance of his own financial interests. *See Zimmerman v. Puccio*, 613 F.3d 60, 75 (1st Cir. 2010).

An appropriate Order follows.

---

[10] In *Evans v. Multicon Const. Corp.*, 574 N.E.2d 395, 399 (Mass. App. Ct. 1991), the court found that this factor did not weigh in favor of veil-piercing even where the corporation did not pay dividends because "[w]hen the corporation is closely held . . . gain may take a form other than the payment of dividends or distributions to stockholders." *Evans*, 574 N.E.2d at 399. *Accord John T. Callahan & Sons, Inc. v. Dykeman Elec. Co.*, 266 F. Supp. 2d 208, 234 (D. Mass. 2003) (citing *George Hyman Constr. Co. v. Gateman*, 16 F. Supp. 2d at 154)).

9

BY THE COURT:

***/s/ Gerald J. Pappert*** 
GERALD J. PAPPERT, J.